**John W. TLAPEK, Appellant,**

v.

**CHEVRON OIL COMPANY, Appellee.**

**No. 18908.**

United States Court of Appeals
Eighth Circuit.

March 6, 1969.

Bernard Whetstone, El Dorado, Ark., for appellant, James E. Stein, El Dorado, Ark., on the brief.

Frank E. Chowning, of Chowning, Mitchell, Hamilton & Burrow, Little Rock, Ark., for appellee.

Before VOGEL and LAY, Circuit Judges, and BECKER, Chief District Judge.

BECKER, Chief District Judge.

### General Statement of Facts

In February 1962, appellant, John W. Tlapek, was employed as a full-time geologist by appellee, Chevron Oil Company, a corporation (whose corporate name then was California Oil Company). Appellant was first assigned to the North Louisiana and Arkansas exploration department of appellee, in which he worked until July 15, 1963, when he was transferred as a matter of routine practice, to appellee's development department for overall training.

While employed in the exploration department, Tlapek was assigned the task of work and study of the Smackover Formation in Southern Arkansas, and other areas in the North Louisiana and Arkansas area. In this work and study Tlapek was given by appellee the use of confidential information of the appellee, including maps, data, analyses, studies, interpretations and other relevant data, acquired over a period of years from appellee's private investigation, research, work and studies, from intercompany exchanges of information, from collected public sources, and from independent commercial services.

With the use of this confidential information relating to the Smackover For-

mation, and while in the employ of appellee, Tlapek developed a unique theory that oil in excess of twenty million barrels could be found, and recovered under favorable economic conditions, in a part of the Smackover Formation, in Columbia County, Arkansas, which became known as the McNeil Prospect. Tlapek prepared a master map which he used in support of his oral presentations of his theory and which became and remained part of the files of appellee.

In 1963, while in the exploration department of appellee, Tlapek revealed his unique theory to his superiors, and on many occasions enthusiastically recommended that appellee immediately begin leasing in the McNeil Prospect, for the purpose of drilling for commercial production. The superiors of Tlapek in the exploration department were interested in Tlapek's theory but were unwilling to disapprove, or approve and transmit, his recommendations for immediate development of the prospect until additional geophysical data were secured through an intercompany exchange of information, which was finally accomplished in the first quarter of 1964.

In the meantime Tlapek was transferred to the development department in July 1963, as stated above.

In his enthusiasm for his theory, and in his impatience, Tlapek became very dissatisfied with the failure of his superiors to act favorably on his recommendations. His original interest and motives in pressing for action by appellee were free of any desire for, or intention to seek, any personal pecuniary interest in the development of the McNeil Prospect. Until his resignation in October 1963, Tlapek urged development of the McNeil Prospect for the profit solely of appellee, his employer.

After his transfer to the development department in July 1963, and through the summer and early fall, Tlapek continued openly to express his disappointment with appellee's failure to proceed immediately to develop the McNeil Prospect, and continued to advocate the development of the prospect by appellee.

In October 1963 Tlapek's immediate superior, District Development Geologist Lane, reported to appellee's District Development Geologist Jackson that he had heard Tlapek intended to resign. Jackson called Tlapek to his office for an explanation. Tlapek reiterated his dissatisfaction with the failure of appellee to develop the McNeil Prospect, and expressed his wish to return in February 1964 for postgraduate work at the University of Missouri, from which he had graduated. In this conference Tlapek informed Jackson, in substance, that the McNeil Prospect should be drilled, and if appellee did not drill it he would see that it was drilled. At Jackson's suggestion Tlapek tendered a written "letter of intent" to return to the University of Missouri February 1, 1964, agreeing to termination of his employment at any time before February 1, 1964, and expressing a preference to continue in appellee's employ until February 1, 1964. Appellee promptly elected to terminate Tlapek's employment effective November 1, 1963, on the grounds of lack of maturity and good judgment.

Shortly after notice of termination of his employment Tlapek came to the office of appellee's Exploration Superintendent Ramsden, the supervisor of exploration in appellee's Northern Division, consisting of 34 states. There Tlapek advised Ramsden of his intention to take some action in respect of the McNeil Prospect. Ramsden suggested that such action would be unethical and that Tlapek defer taking action for at least six months.

After termination of his employment by appellee, and without adequate capital in hand, Tlapek openly began a leasing program in the McNeil Prospect. With $1,600 borrowed from his father he financed the first lease payments. From his neighbors and others, whom he interested in lease speculation, he secured several thousand dollars for additional lease payments and expenses. Eventually about 2,600 acres were leased. Tlapek was named as lessor in each of the leases which were recorded without unusual delay. The leases were executed in the

months of January, February and March 1964 and recorded in the months of March and April 1964. Some early leases were executed conditionally, with payment therefor dependent on assembly of an adequate block of leases. Various agreements concerning interests in the leases were negotiated by Tlapek with others to secure resources for drilling and production. Finally, a drilling contract was negotiated and the preliminary drilling work was in progress when the filing of the complaint herein, and subsequent filing of notice of *lis pendens*, caused a cessation of drilling.

During his efforts to develop the prospect Tlapek made no effort to conceal his activity. On more than one occasion Tlapek voluntarily informed appellee's Exploration Geologist Gunderson, then assigned to the Smackover area, of his leasing activities. Gunderson promptly reported this information to his superiors in appellee's organization. On several occasions in 1963 and 1964 Tlapek freely discussed his leasing intentions and activities with appellee's Senior Geologist Humphris, his former superior. In March 1964, Tlapek visited Ramsden and made a full disclosure of his activities. He then offered to sell appellee a half interest in the venture for money to finance the drilling. This offer was not accepted. Instead, at the suggestion of appellee's legal department, Ramsden sent to Tlapek a formal letter dated March 13, 1964, stating appellee's position, which was construed by Tlapek to be a "threatening letter".

When appellee learned of the intention of Tlapek and his associates to drill, it filed on May 8, 1964, this civil action in the nature of a suit in equity. At that time the McNeil Prospect was still under consideration by appellee, but its feasibility had been questioned in a recommendation by appellee's Geologist Andress, based on additional geophysical data recently secured by appellee. This recommendation dated May 4, 1964, was subject to further review by appellee. The filing of this action resulted in practical suspension of appellee's consideration of development activity concerning the McNeil Prospect, until the legal issues in the litigation should be determined.

Appellee elected to pursue this equitable claim for relief (against appellant, his assignees and privies) stating that a constructive trust existed in the leases secured by appellant Tlapek, because of the acquisition of the leases through the use by Tlapek of confidential information in violation of a fiduciary duty to appellee. (A non-competitive contract between Tlapek and appellee existed but is not relied on and was not preserved in the record before us.)

Appellant Tlapek filed a counterclaim against appellee based on alleged bad faith and lack of justification for filing the complaint. Several cross claims, not material here, were filed by defendants in this action.

### The Decision of the Trial Court

After a trial before the Court, without a jury, the trial court decided all issues in favor of the appellee on appellant's claim for relief; impressed a constructive trust on all leases in question, and assigned interest therein (except fractional assigned interests of four bona fide purchasers for value without notice); cancelled all assignments by Tlapek and his wife to purchasers with actual or constructive notice; and rendered a money judgment against appellant for a net sum of $8,500.00 found to be appellant's net profit resulting from the consideration paid by the bona fide purchasers for value without notice. Further the Court found against appellant on his counterclaim, and against all cross-claimants. Only the appellant Tlapek appealed from the judgment of the trial court.

The findings of fact, conclusions of law and judgment of the trial court are contained in a lucid and detailed opinion by Chief Judge Harris, reported as Chevron Oil Company v. Tlapek (W.D.Ark.) 265 F.Supp. 598.

*Disposition on Appeal*

On all principal issues presented the judgment below is affirmed. Only on the issue of reimbursing appellant Tlapek for the original costs of the lease interests is the cause reversed and remanded.

*Rulings on Assignments of Error*

I

In his first assignment of error, the appellant contends, in substance, (a) that the trial court erred in concluding that a constructive trust existed, because no clear and convincing proof of fraud on the part of appellant was produced and no express finding of fraud made; (b) that there was no proof that trade secrets were used by appellant, consequently no confidential relationship existed between appellant and appellee; and (c) that the trial court failed to recognize that appellant had the right to use his knowledge and experience to earn a livelihood.

We find these factual and legal contentions to be without merit.

(a)

█ There was ample evidence that the appellant, while in the employ of appellee, developed his unique theory concerning the McNeil Prospect from the use of confidential information, to which he was granted access by appellee while in appellee's employ as a geologist, a position of trust and confidence. It is not disputed that the theory was unique. These findings were established by clear and convincing evidence, and were not erroneous in any degree.

Nevertheless, appellant argues that he was candid, bold and outspoken in his intentions and activities in respect to the McNeil Prospect; that "a setting for a constructive trust is invariably one where the central character has been guilty of deceit, highhandedness and fraud"; that no such conduct was proven in this case.

█ The law of Arkansas governs this case. The parties here and the trial judge below relied upon Arkansas law, and authorities deemed by the trial court to be persuasive in Arkansas. The conclusion that the established facts in this case created a constructive trust was, to say the least, a permissible view of the law of Arkansas. Indeed, it would appear that Arkansas follows the general rule that actual fraud is not necessary to create a constructive trust based on misuse of confidential information. It was permissible for the trial court to conclude that Arkansas follows the general rule stated in an annotation in 165 A.L.R. 1453 at page 1454 as follows:

"The law is well settled that one of the implied terms of a contract of employment is that the employee will hold sacred any trade secrets or other confidential information which he acquires in the course of his employment, and that therefore an employee who has left his employment is under an implied obligation not to use trade secrets or other confidential information which he has acquired in the course of his employment, for his own benefit or that of a rival, and to the detriment of his former employer."

Arkansas cases are cited in support of the rule. The rule was followed in an earlier Arkansas diversity case. Harris Manufacturing Company v. Williams (W. D.Ark.) 157 F.Supp. 779, l. c. 784.

Appellant relies on the following quotation from 4 Pomeroy's Equity Jurisprudence, Section 1044, page 94:

"An exhaustive analysis would show, I think, that all instances of constructive trusts properly so called may be referred to what equity denominates fraud, either actual or constructive, as an essential element, and as their final source".

This language is consistent with the trial court's conclusions in this case and with the remaining portion of the quoted paragraph, part of which is as follows:

"Certain species of the constructive trusts arise from actual fraud; *many others spring from the violation of some positive fiduciary obligation; in all the remaining instances there is, latent perhaps, but none the less real,*

*the necessary element of that unconscientious conduct which equity calls constructive fraud."* (Emphasis added.)

■ Here a clear violation of fiduciary duty was found by the trial court to exist. The fact that the appellant was candid, bold and outspoken in the course of the violation of duty does not excuse the violation, under the applicable law.

The conclusion that a constructive trust existed is not erroneous because the trial court did not expressly find appellant's conduct to be fraudulent. The conclusion on the facts that a constructive trust should be declared was sufficient to indicate the finding of constructive fraud, if necessary to the decision. The modern tendency in this field is to avoid use of the term "fraud". See the Restatement of the Law of Restitution, Section 200, page 812, in which the following rule is stated without reference to the term "fraud":

> "Where a fiduciary in violation of his duty to the beneficiary acquires property through the use of confidential information, he holds the property so acquired upon a constructive trust for the beneficiary."

In 3 Pomeroy's Equity Jurisprudence, Section 922, page 625, it is noted that the term "constructive fraud" is not a very appropriate term, which is applied to a great variety of transactions, covering different grades of wrong.

The trial court's conclusions concerning the Arkansas law relating to the equitable consequences of appellant's unauthorized use of confidential information are not only permissible, but appear to be sound.

### (b)

Next appellant contends no use of trade secrets was shown. We disagree.

■ The trial court reached a permissible conclusion that the confidential information in this case was protected from unauthorized use. The term "trade secret" was not used. But use of the term was not necessary. The trial court

on this issue followed the language of Hunter v. Shell Oil Co. (C.A. 5) 198 F.2d 485, which it found persuasive. The trial court implicitly found the information to be the equivalent of trade secrets by reliance on authorities defining the term. Kalinowski, Key Employees and Trade Secrets, 47 Va.L.Rev. 583, and Winston Research Corp. v. Minn. Mining & Mfg. Co. (C.A. 9) 350 F.2d 134.

Further, appellant repeatedly contends that there were in fact no trade secrets and no confidential information, because the record compels the conclusion that all the information furnished by appellee and used by appellant in developing his theory was available for purchase from other private and public sources at low costs. The record does not support this factual contention. While some of the information was so available, some was not. The record supports a finding that much of the information (including gravity contours, surveys and interpretations of appellee's geophysicists, reports of appellee's research laboratories, and phases representations obtained from microscopic study by appellee's geologists) was not available from other sources.

■ Even if appellant were correct in his factual contentions, appellee would nevertheless be entitled to relief because the unique theory conceived by appellant, while employed by appellee, was in itself confidential information which appellant was not free to use for his private gain. This conclusion of law was clearly stated by the trial court, and is not erroneous.

■ In urging that the trial court erred in awarding relief to appellee without expressly finding that the information constituted trade secrets, appellant relies on Harris Manufacturing Company v. Williams, *supra*, in which the finding was expressly made and relief granted, and on McGraw-Edison Company v. Central Transformer Corp. (C.A. 8) 308 F.2d 70, in which a finding was made that no trade secret or confidential relationship existed as a basis of denying relief. Neither of these cases supports a conclusion that the trial court erred in this

case. The information here was clearly disclosed in confidence, and clearly satisfies all the definitions of protected confidential information approved and followed in the *Harris* case, *supra*, including Restatement of Torts, Section 757, Comment (b), which contains the following statement:

> "*Information not a trade secret.* Although given information is not a trade secret, one who receives it in a confidential relation or discovers it by improper means may be under some duty not to disclose or use that information."

See also Restatement of Agency 2d, Section 396 (mentioning trade secrets or "other similar confidential matters"); Kalinowski, supra, 47 Va.L.Rev., pages 593, 595; V Scott on Trusts (3rd ed.) § 505, 3564–3567.

For these reasons it was not error for the trial court to fail to use the term "trade secrets" in its findings and conclusions.

#### (c)

Appellant argues that the trial court failed to recognize that appellant had the right to use his knowledge and experience to earn a livelihood. In support of this argument appellant relies on cases in which there was no use by the former employees of confidential information or trade secrets. The findings of fact in this case render those cases inapplicable and the argument without merit. It is the general rule that this recognized right to earn a livelihood is qualified by a restriction on the use of information developed as a result of the employer's initiative and investment, and entrusted to the employee in confidence. This clearly appears from the authorities cited by the trial court and hereinabove. The trial court reached a permissible conclusion that the law of Arkansas was in accord with the general rule.

#### II

Next appellant assigns error contending that the trial court erred in refusing to hold the appellee guilty of laches and estoppel, relying upon Sanders v. Flenniken, 180 Ark. 303, 21 S.W.2d 847, and inapposite federal cases, in addition to the cases distinguished by the trial court in its opinion. The facts in the *Sanders* case are quite unlike this case in may respects, including the delay in taking action for eighteen years, and until oil had been discovered. Cf. Russell v. Republic Production Co. (C.A. 5) 112 F.2d 663. In concluding that the appellee was not guilty of laches and estoppel under Arkansas law, the trial court reached a permissible conclusion, supported by findings of fact based on substantial evidence and consistent with all authorities relied upon by appellant.

#### III

The appellant's third assignment of error, that the Court erred in refusing to find the appellee's action to be without merit, and in refusing to award damages on appellant's counterclaim, is unfounded. In view of the affirmance of that part of the judgment, finding merit in appellant's claim and impressing a constructive trust on the leases, this assignment of error cannot be sustained. Moreover, the record supports the trial court's finding that there was no proof of the allegations of the counterclaim.

#### IV

The final assignment of error, that the Court erred in holding that plaintiff was entitled to only $1,500.00 expended in acquisition of the leases, must be sustained. From the outset, in its complaint and amendments thereto, the appellee recognized its undisputed obligation to reimburse appellant for the reasonable original costs of acquiring the leases impressed with the constructive trust, excepting only the leases found to be assigned to innocent purchasers for value. It is not denied that this obligation to pay for the original costs was in equity a condition of appellee's securing the legal title to the leases by enforcement of the constructive trust. V Scott on Trusts (3rd ed.) § 479, 3459–60; cf.

Hunter v. Shell Oil Co., *supra,* at page 488, relied on by the trial court. The trial court properly charged appellant with the sum of $10,000.00 received from the innocent purchasers for value of a fractional interest in the leases. V Scott on Trusts (3rd Ed.) § 479, 3460. But it credited appellant with only "the sum of $1,500.00 expended by him as acquisition costs of said leases". 265 F. Supp. at page 607. In its ultimate conclusions of law the trial court described the credit as "the sum of $1,500.00 expended by John W. Tlapek *personally* as a *part of the cost* of the acquisition of the leases involved in this suit." (Emphasis added) 265 F.Supp. at page 613.

 From the record, it is clear that appellant was not given credit in the findings for all of the original cost of acquisition of the leases impressed with the trust. Appellant was examined in detail on the amount of the original acquisition costs by appellee's counsel. He testified without contradiction that he borrowed $1,600.00 from his father to make the down payment on the first two leases; that he put in $1,500.00 of his own money; that he secured $15,041.00 from assignments of fractional interests to others; that he leased the acreage (about 2,600 acres) by original payments to lessors of $5.00 to $10.00 per acre, in the total sum of $18,000.00 for the lease bonuses; that including miscellaneous additional fees for recording, tax stamps, drafts, notaries, and costs for lease forms, maps, materials, and minor expenses, the total costs were $19,710.13. It does not appear whether this total includes the reasonable value of appellant's services in the acquisition of the leases, to which he may be entitled. It does appear, however, clearly from the record that either the finding of the total acquisition costs was clearly and erroneously low as a matter of fact, or that an erroneous equitable standard was applied which limited appellant to credit only for his out-of-pocket cash expended in acquisition of the leases.

Since appellee chose to secure cancellation of the assignments of interests in the leases to other than innocent purchasers for value, appellee is not entitled to credit for the consideration paid for the cancelled assignments. Nor can appellant be lawfully denied credit for borrowed money, and other money spent as original costs of acquisition of the leases.

Since there is no appeal by the assignees whose assignments were cancelled, we need not rule on appellant's alleged legal obligations to them for which no relief was granted. In respect to rights of other assignees and contractors against whom the suit was voluntarily dismissed in the trial court, no opinion need be expressed.

The finding that appellee was entitled to the $10,000.00 received from the innocent purchasers is correct, but the portion of the judgment that the appellee recover from appellant the sum of $8,500.00 is clearly erroneous and should be reversed.

### Conclusion

For the foregoing reasons the judgment of the trial court is affirmed in all respects, except the finding that appellant is entitled to recover only $1,500.00 as original costs of acquisition of the leases. Therefore the portion of the judgment that appellee recover from appellant the net sum of $8,500.00 is reversed. The cause is remanded for further proceedings, including proceedings to determine the reasonable acquisition costs of the leases, consistent with this opinion. Because of the affirmance of part of the judgment below, and the reversal of part of the judgment below, it is ordered that the costs of this appeal be taxed one-half to the appellant and one-half to the appellee.