**NUCOR CORPORATION, Plaintiff,**

v.

**TENNESSEE FORGING STEEL SERVICE, INC., et al.,
Defendants.**

No. T–72–C–11.

United States District Court,
W. D. Arkansas,
Texarkana Division.

Feb. 25, 1972.

Bradley, DeLaney & Millett (Ernest S. DeLaney, Jr., and Channing Richards), Charlotte, N. C., W. H. Arnold, III, Arn-old & Arnold, Texarkana, Ark., for plaintiff.

James H. Pilkinton, Hope, Ark., Smith, Williams, Friday, Eldredge & Clark by Herschel H. Friday and Frederick S. Ursery, Little Rock, Ark., Martin, Hopkins & Lemon by John G. Rocovich, Jr., Roanoke, Va., for defendants.

## MEMORANDUM OPINION

PAUL X WILLIAMS, District Judge.

On February 2, 1972 the plaintiff, NUCOR, a Delaware Corporation, filed complaint against the defendants, Tennessee Forging Steel Services Inc., a Virginia Corporation, Charles N. Munn, William White and City of Hope, Arkansas, the prayer of which is as follows:

"WHEREFORE, plaintiff prays the court as follows:

"1. That a preliminary restraining order issue after notice and hearing enjoining the defendants, their agents and employees from making any use of any construction plans of the plaintiff for joist plants or any plans copied directly or indirectly from any plans of the plaintiff to construct a joist plant in or near Hope, Arkansas or any other place until final hearing of this matter.

"2. At said final hearing, that a permanent injunction issue enjoining the defendants from making any use of any construction plans of the plaintiff or any plans copied therefrom, directly or indirectly, to construct any joist plant and that the defendants be ordered to return to the plaintiff any property of the plaintiff including construction plans, specifications, materials, notes, forms or any property of any nature taken from the plaintiff or copied directly or indirectly from the plaintiff's property.

"3. That the plaintiff recover its costs and that it have such other and further relief as the court may deem just."

At the same time the plaintiff gave notice that on February 25th it would

apply for a preliminary restraining order.

On February 25th, evidence was taken before the court to the hour of adjournment, then resumed on March 1, 1972, (at which time the defendants filed answer) and tried to a conclusion except for the deposition of G. K. King which has subsequently been filed.

NUCOR has been producing steel joists some 8 years and has become the largest producer of such joists in the United States with plants in Florence, South Carolina; Ft. Payne, Alabama; Norfolk, Nebraska and Grapeland, Texas and with plans for a fifth plant at Ft. Wayne, Indiana. By paying no dividends to its stockholders and utilizing its profits to expand and improve its facilities; and due to the intelligent, driving leadership of its management headed by Mr. Ken Iverson, NUCOR is now a leader in its field. Mr. Iverson, without hesitation, makes any changes he thinks for the best interest of NUCOR including selection, hiring and firing of topflight personnel and the procurement of materials at the most advantageous prices.

The designs for bar joists are in general governed by the Steel Bar Institute with local ingenuity furnishing specialty designs to fit particular demands. An over simplification is to say that Bar Joists are made by using angles and rounds, cut, bent and welded to make an adequately strong, but less expensive support than the older style I Beams. The machines used for cutting, bending and welding are more or less standard. Each Bar Joist Fabricator tries to manufacture the joists more economically than his competitors. Some of them started their process in an open field, then progressed to a building, some being "I", some "H", some "T" and some "E". It is fair to say that such buildings are generally what are referred to by some witnesses as "Tin Can" buildings, being large, substantial metal buildings to shelter the personnel and material and provide storage. There is nothing strange, new, unique or secret about the buildings. They are used for the purpose of shelter and have nothing to do with the fabrication of the joists. The shape and size are determined by the wishes and possibly the financial resources of the builder. The "work line" is fed with materials according to the whim and desire of the management, some of whom like the "Work Bay" to be 40 by 60 and some 50 by 50 and others of different size.

Each fabricator tries to keep labor and material costs at a minimum so that he can undersell his competitor in the bidding market because profit is still determined by income less expense.

When the joists are built and ready to deliver they are not wrapped, covered or protected from observation or inspection by any and all who care to look at them. There is no patent or legal protection of a bar joist to prevent duplication. Any person who has the proper metal and proper tools can make any kind of joist he cares to make. NUCOR does not contend that it is the only concern legally permitted to fabricate steel joists. In fact it alleges that there are more than forty such fabricators known to it and each and all of them can and do fabricate joists. There is no legal prohibition against anyone or all of the Fabricators making steel joists exactly like the ones NUCOR builds. If one chooses he can buy a joist from NUCOR and then build others like it. It is not subject to patent. Practically any and every conceivable type of joist is pictured and described in the S.B.J. manual along with the engineering information of what weight it will bear and stress it will stand.

In 1967 NUCOR built a joist plant at Grapeland, Texas using plans prepared by NUCOR'S engineers.

The plaintiff's Grapeland plans did not include the machine layout for the plant. The plans only indicated in what area the various basic processes such as cutting, welding, et cetera, were to be carried on.

The plans for the plaintiff's plant at Grapeland, Texas, were prepared in 1967

by the drafting department of the plaintiff's Norfolk, Nebraska, plant under the direction of Wayne Studebaker. Mr. Studebaker designed this building from information and suggestions given him by other employees of the plaintiff and from discussions with various joist manufacturers. When the Grapeland plans were completed in the latter part of 1967, Studebaker sent from 15 to 30 sets of these plans to the defendant White, who was the plaintiff's manager of construction, and who had extensive construction experience, knowing that White would send these plans to various contractors and subcontractors in order to obtain bids and construct the Grapeland plant. There was nothing printed on the plans to indicate that they were confidential. No deposits were required from the subcontractors when they received the plans. No effort was made to see that the plans were returned or to keep track of the various sets of plans.

The defendant, William White, an employee of NUCOR was in charge of the construction. Copies of the plans were made available for the use of bidders and to refer to as the building progressed. The plans contained no notice that they were confidential or limited as to publication, no deposits were required from bidders or subcontractors and there were no requisites that they be returned.

The plaintiff has never prohibited competitors or the general public from free access to and the opportunity to observe its plants and its manufacturing processes and procedures. On many occasions the plaintiff has conducted competitors and the general public on tours of its plants during operating hours. Plaintiff is justifiably proud of all four of its plants and has distributed 10,000 catalogs (40,000 annual reports) containing aerial photographs of all four plants. These photographs showed the basic design of the structures. While competitors and members of the general public did not inspect specific building plans in connection with their touring of and observing the plants, the evidence reflects that there is nothing on the plans (and in particular nothing on the plaintiff's plans for its Grapeland plant) which would not be readily apparent to any competitor or knowledgeable person touring or observing plaintiff's plants.

In preparing to construct its plant at Grapeland, no effort or arrangement was made to cause the plans to be returned after being used for bid purposes. The building was erected in plain view of the general public. No effort was made to conceal any part of the construction as being secret or confidential.

After the building was complete and the plant was in operation NUCOR made arrangements for plant tours. The Chamber of Commerce at Grapeland was proud of and toured the plant. So far as the evidence reveals no one was turned away. If competitors came to view and observe they were afforded the same courteous treatment. Interested persons did visit, did view and did obtain ideas of efficiency from what they saw at the Grapeland plant.

NUCOR does not contend that it has obtained or even attempted to obtain a statutory copyright on its Grapeland plans.

NUCOR does not contend that it has a patent or has attempted to obtain a patent on any manufacturing procedure it used.

■ NUCOR contends that it has a common law copyright in the Grapeland plans and that the plans prepared by King for White are similar in so many particulars that its common law property right in the Grapeland plans has been violated.

The defendants claim that their plans are not the same as the Grapeland plans; that the similarities result from being plans for the same type of building for manufacturing steel bar joists; and further that NUCOR gave general publication to its Grapeland plans and any protected right it may have had was lost by the general publication.

18 C.J.S. § 6, page 140 states:

"Common-law property rights in intellectual productions are of indefinite or perpetual duration, continuing in the owner until abandoned or lost by a general publication."

18 C.J.S. § 13, page 150 states:

"Publication is the act of making public or known, as by offering for sale or distribution, the subject matter in question, and in determining whether there has been publication the courts will consider the nature of the subject matter, the character of the communication, circulation or exhibition, and the nature of the right secured. . . ."

The "roll of plans" for the Grapeland plant was the property of NUCOR and NUCOR had a common law right of copyright in it. The personal property ownership of the original roll of plans and the thirty copies thereof was in NUCOR. If NUCOR gave the plans general publication, the common law protected copyright was lost.

The Court finds that by giving the approximately thirty sets of plans to bidders; by placing no limitation on their circulation, by permitting any and all interested people to see, visit and inspect the building in all stages of construction and the entire plant when in operation after construction was completed, as well as by its conduct and advertising campaign NUCOR gave the plans general publication; and after general publication there was no protected common law copyright.

This is not to say that NUCOR does not own its own "roll of plans" as personal property. It does. But it does not own as personal property those rolls of plans which it gave away to interested bidders as a part of general publication. The donees of the plans owned the "roll of plans" given to them and after general publication were entitled to use the information contained in them if and when they set about preparing plans for themselves.

The Court has not overlooked the cases cited by able counsel for the plaintiff, particularly the following: Wood v. Skene, 347 Mass. 351, 197 N.E.2d 886; Smith v. Paul, 174 Cal.App.2d 744, 345 P.2d 546, 77 A.L.R.2d 1036; Vic Alexander Const. Corp. v. Cheyenne Neon, Wyo., 417 P.2d 921; DeSilva Const. Corp. v. Herrald, D.C., 213 F.Supp 184, and we desire to quote from the *DeSilva* opinion the following language appearing at page 197:

"While none of these acts taken in isolation might warrant the conclusion that the plaintiff's assignor evinced an unmistakable intent to abandon any right in said architectural plans, *the totality of this evidence, taken as a whole,* compels but one conclusion—that neither the Weissmans nor the New York corporation had any idea of claiming any copyright, common law or statutory, until the negotiations for the purchase of their model house with the LaHurds and the Herralds broke down. While it is humanly understandable that the Weissmans were highly aggravated when they realized that two excellent prospects backed down, and especially when they learned that said prospects decided to build houses similar to the model house of the Weissmans through other builders, there is no factual or legal evidence in the record which would justify a conclusion that the common law copyright in said architectural plans was not published and dedicated to the public long before the plaintiff's assignor applied for the statutory copyright. The failure to preserve the common law copyright inviolate and intact until the acquisition of the statutory copyright is, of course, fatal as stated above; and it is the opinion of the Court that the architectural plans were not copyrightable on March 30, 1961, the alleged date of first publication, by virtue of § 8, Title 17 U.S.C."

(Emphasis added.)

From the totality of the evidence in this case the Court finds general publi-

cation of the Grapeland plans by the plaintiff and consequently loss of the right of common law copyright.

█ Defendant, William White, was an employee of NUCOR for several years prior to his resignation on January 14, 1972. He was in charge of construction of the NUCOR plant at Grapeland, Texas. Having supervised the erection of the building and the installation of the joist plant at Grapeland he had much personal information about the plant layout and the details of erecting the building and installing the plant. In the first place he was an expert builder, recognized by Mr. Iverson as such or he would never have been employed by NUCOR.

The defendant White terminated his relationship with the plaintiff on or about January 14, 1972. He formed his own consulting firm which he called the Acme Company. He did not become an employee of Tennessee Service. In December of 1971 the defendant Munn, as president of Tennessee Services, asked White to cause to be prepared some construction plans for a bar joist plant. Munn and White entered into a verbal agreement, which could be terminated at any time, that White would become a consultant to Tennessee Service in the construction of its Hope plant. He was to be reimbursed for his costs in furnishing the plans and he was to receive an annual fee of $25,000.00. White asked King to prepare a set of plans for a joist plant of the same general type as the Grapeland plant but with material differences. These differences included the length and width of the plant, the dimensions of the bay area, column sizes, truss design, and crane rail design, as well as difference in size of the building.

Mr. King prepared plans of a building of the type White requested and delivered them to him on or about January 11, 1972. The plans were similar to the Grapeland plans but were different in many ways. They did however reflect a building of the same general nature. King's charge for preparing the plan for White was $2,700.00. Pursuant to his

consultant's contract, White began to obtain bids on the construction of the Hope plant and to supervise the construction. Several modifications and changes were made by White in the plans which King had prepared. The entire electrical layout for the plant was re-designed and the office building plans were completely changed.

Even when the common law copyright has been held to be in effect it has not been extended to such an extent as to prevent the erection of buildings that are merely similar.

Mr. King's plans for Tennessee Forging were and are a separate, distinct, set of plans. There are similarities to the plans for Grapeland, but there are also material differences. In drafting plans it is and always will be necessary to use straight lines, angles, curves, etc., and the geometric shape of succeeding buildings will be or can be similar; but it is not reasonable to say that because the plaintiff has built a four sided building no other builder can ever again build a four sided building.

Not only are the plans prepared by Mr. King for Mr. White (Tennessee Forging) different from the plans of NUCOR; but the similarities are not *of such* nature as to be exclusive or protected to NUCOR.

We repeat again that NUCOR made no effort to obtain a statutory copyright and has not done so to date. In fact, no mention is made in plaintiff's complaint of a copyright although the prayer of the complaint is for an injunction against defendants to prevent use of any construction plans copied directly or indirectly from any plans owned by the plaintiff.

█ Having determined that if there were a common law copyright, the common law copyright terminated upon general publication, we now discuss the matter of "Trade Secrets".

Honorable John E. Miller, now Senior Retired Judge of United States District Court for Western District of Arkansas, discussed trade secrets in the case of

Harris Manufacturing Co. v. Williams, (1957) 157 F.Supp. 779, at 785, and used the following language:

"The Court of Appeals for this Circuit in Sandlin v. Johnson, 8 Cir., 141 F.2d 660, recognized the general rule and approved the Restatement of Tort's definition of a trade secret as being 'a trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.' "

Judge Oren Harris, present Chief Judge of the Western District of Arkansas followed the above definition in the case of Tlapek v. Chevron Oil Company, which was approved by the 8th Circuit in 407 F.2d 1129.

Referring to the testimony of Mr. Iverson, we find no specific claim of Trade Secret in any item of the manufacturing process; plaintiff's contention being rather that the entire operation of NUCOR is a "trade secret".

We cannot accept this theory. Our examination of the evidence reveals that there is nothing unique or special about the "Tin Can" style of metal building; there is nothing secret or unique about the cutting, bending or welding of the bar joists fabricated by NUCOR; there is no unique, secret or even unusual business practice employed by NUCOR that is not well known in the business and manufacturing industry.

Under Mr. Iverson's direction the overall business has prospered because of good management, not because there are trade secrets which have been revealed to trusted employees.

As stated in the case of McGraw-Edison Co. v. Central Transformer Corp. (1962) 308 F.2d 70, at 73:

"The tort liability asserted by appellant depended on proof of a 'trade secret' "

The plaintiff fails to point out a "trade secret" and the Court is unable to detect one from the evidence in this case.

Mr. Munn testified that he probably had some items of property in his possession which really belonged to NUCOR. These items, whatever they are, should be returned to NUCOR even though not prayed or asked for in plaintiff's complaint.

The City of Hope, Arkansas has not violated any duty to anyone and in final argument, the able attorney for NUCOR so stated.

Under the circumstances in this case plaintiff's complaint should be dismissed at plaintiff's costs and the Clerk will prepare such order.

Said order will provide that Mr. Munn return to NUCOR any items of property of NUCOR which he holds.