Jack L. BRIGGS, Plaintiff, Appellant,

v.

R. R. DONNELLEY & SONS COMPANY,
Defendant, Appellee.

No. 78–1154.

United States Court of Appeals,
First Circuit.

Argued Sept. 11, 1978.
Decided Dec. 15, 1978.

James J. Mullen, Providence, R. I., for appellant.

Robert A. Downing, Chicago, Ill., with whom Sidley & Austin, Chicago, Ill., Andrew F. Lane, and Gaston, Snow & Ely Bartlett, Boston, Mass., were on brief, for appellee.

Before COFFIN, Chief Judge, CAMP-BELL, Circuit Judge, DUMBAULD *, Senior District Judge.

DUMBAULD, District Judge.

Plaintiff-appellant, Jack L. Briggs, after 32 years in various capacities with defendant-appellee R. R. Donnelley & Sons Company, (hereinafter called Donnelley) had been vice-president and director of the Chicago manufacturing division of defendant for four years when he resigned on May 3, 1968. Donnelley is said to be the largest commercial printer in the United States, doing business on a world-wide basis, and having other plants in California, Connecticut, Illinois, Indiana, Kentucky, New York, Pennsylvania, and Tennessee.

Donnelley in 1965 set up a deferred compensation plan for certain executives,[1] pursuant to which Briggs elected to have 10 percent of his 1966 salary, and 15 percent of his salary for the following two years, withheld and credited to his account under the

---

* Of the United States District Court for the Western District of Pennsylvania, sitting by designation.

1. Executives to be eligible for the plan had to be 45 years of age and earning $50,000 per year or more. Briggs' salary was $65,000. Including income deferred under the plan, plaintiff's salary when he resigned was $78,000.

plan. A total of $23,715.13 was thus withheld.

Upon leaving Donnelley, Briggs became president of McCall Printing Co. in New York and served from July 15, 1968 to November 15, 1969 in that capacity. From December 1, 1969 until March 16, 1970 he was vice-president of W. R. Bean & Sons, Inc. of Atlanta and thereafter became president of Providence Gravure, Inc., at Providence, Rhode Island. All three companies are admitted to have been competitors of Donnelley. The nature of the work performed at McCall, according to plaintiff's testimony, was similar to that performed for Donnelley.

The plan provided that deferred compensation was to be paid in ten equal annual installments commencing on January 1 of the year following the year in which the employee's employment was terminated for any reason other than death.

Moreover Section 9(c) of the plan provided that:

If, without the prior written consent of the Company, any Participant or former Participant shall engage in any activity in competition with the Company during his employment or within three years after his retirement or termination of employment his participation in the Plan shall thereupon automatically terminate and the Company thereafter shall have no obligation to make any payments to such Participant or former Participant or to any person claiming through or under such Participant or former Participant.

Briggs did not seek Donnelley's consent to his employment with the McCall organization. Accordingly, on July 29, 1968 Donnelley notified Briggs that benefits under the plan were cancelled by reason of his entering the employ of a competitor within three years of the termination of his employment with Donnelley.

Briggs contends in this action that the provisions of 9(c) of the plan are invalid as contravening public policy. Briggs emphasizes that this denial of benefits under the plan amounts to forfeiture of his own (not Donnelley's) contributions to the fund.[2] He is deprived of money that he has already earned,[3] the payment of which was deferred merely for the purpose of affording him a tax benefit available under pre-1969 law.

Briggs urges that the requirements of the Employee Retirement Income Security Act of 1974 (commonly designated as ERISA) regarding non-forfeitability evince a public policy against forfeiture of "an employee's rights in his accrued benefit derived from his own contributions."[4] . However, that federal legislation was subsequent to the transaction involved here, and does not proclaim with lucidity what the public policy of Illinois was in the years from 1965 through 1968.

Moreover, in any event public policy is an "unruly horse"[5] and it is seldom that a contract deliberately entered into by knowledgeable parties without undue influence or lack of genuine equality of bargaining position can be upset by a court.

---

**2.** As stated in the opinion of the District Court: "The crux of plaintiff's argument is that the covenant at bar is contrary to public policy because the monies forfeited by operation of the covenant are for the most part plaintiff's own contributions to his deferred compensation account. Once invested in the Plan by plaintiff, however, these monies were not unlike other employee benefits."

**3.** Section 4 of the plan makes clear that deferred compensation under the plan is to be "withheld from amounts of salary and supplementary compensation which would otherwise be payable" during the calendar year involved. In other words the compensation forfeited under 9(c) is for services already performed by Briggs for Donnelley, and has already been earned by Briggs.

**4.** 26 U.S.C. § 411(a)(1).

**5.** "I, for one, protest . . . against arguing too strongly upon public policy;—it is a very unruly horse, and when once you get astride it you never know where it will carry you. It may lead you from the sound law. It is never argued at all but when other points fail." Mr. Justice Burrough in *Richardson v. Mellish*, 2 Bing. 229, 252 (C.P. 1824). On the general subject see Percy H. Winfield, Public Policy in the English Common Law, 42 Harv.L.R. (1928) 76.

In the case at bar Briggs admitted in his testimony that he was fully aware of the terms of the plan and voluntarily elected to participate in it.[6] *A fortiori,* he was aware of the consequences of becoming a senior officer of a major competitor of Donnelley, when he voluntarily resigned from Donnelley's and within two months became president of McCall's. Undoubtedly, he took into account his loss of benefits under the plan when negotiating with his new employers regarding the salary and other perquisites he was to receive.

■ Under Illinois law the restraint of trade imposed by an employee's covenant [7] not to compete is not illegal *per se,* but depends upon the reasonableness of the agreement in the light of the particular facts involved. *See, e. g., Dunn v. Shepherd,* 25 Ill.App.3d 825, 323 N.E.2d 853 (5th Dist. 1975); *Johnson v. Country Life Insurance Co.,* 12 Ill.App.3d 158, 300 N.E.2d 11 (4th Dist. 1973). Among the factors to be considered are the temporal duration and geographical extent of the commitment not to compete, whether it constitutes appropriate protection for a legitimate business interest of the employer, whether it deprives the public of a needed service, or imposes undue hardship on the employee. For example, a provision forbidding forever the practice of his trade or calling by an employee would ordinarily be considered as unreasonable with respect to time. Such a provision would also have a harsh economic impact upon the employee's earning power, and might also be deleterious to the public by impairing the effective functioning of the economy under the particular conditions.

The most dubious or questionable feature of the provision involved in the case at bar is its lack of geographical limitation. Conceivably such an unrestricted prohibition might condemn an employee to unmitigated idleness and indigence. In the case at bar, however, its impact is softened by the short time period involved, the reasonableness of which has not been challenged.

■ Moreover, even if one might hesitate to sustain such a world-wide restriction *in vacuo,* even where the employer is said to do a world-wide business, plaintiff in the case at bar has conceded that the companies for whom he worked after leaving Donnelley did in fact compete substantially with his former employer. Thus any theoretical overbroadness becomes academic under the actual facts of this case. Whether plaintiff's ability and training would have enabled the now defunct London Times to prolong publication, and similar speculative matters, need not be investigated. We conclude, as did the District Court, that the covenant here involved was reasonable, and was appropriate for the protection of a legitimate business interest on the part of Donnelley.[8]

Consequently Briggs can not escape on grounds of public policy the operation of the voluntarily-bargained plan which he knowingly participated in. His situation is basically the same as if he had invested $25,000 in a bowling alley, which would be a total loss if popular demand for that game did not continue for a three year period; and unfortunately the public taste changed during the first year and he lost his money. Here the conclusion follows *a fortiori,* how-

---

6. As stated in the opinion of the District Court: "defendant was under no obligation to offer the deferred compensation plan and plaintiff was under no compulsion to accept it."

7. Speaking accurately the provision contained in 9(c) is not a *covenant* obliging plaintiff to a particular course of conduct, but merely a *condition* non-compliance with which deprives him of anticipated benefits. With respect to the validity of the provision as determined by criteria of reasonableness, however, nothing turns on this distinction, and it will be convenient to use the familiar phrase.

8. Donnelley's case is rather weak with respect to proof of any actual injury from unfair use by Briggs of confidential information obtained during his employment with Donnelley. But such proof is not necessary to establish the reasonableness of Section 9(c), which was part of a general plan applicable to a number of senior executives who did or could have access to information which might have been used to Donnelley's detriment.

ever, as it was not the fickle preference of the public but his own voluntary decision which led him to resign from Donnelley and almost immediately become president of a competing company.

*The judgment of the District Court is affirmed.*