### CEDAR SWAMP HOLDINGS, INC., et al., Plaintiffs,

v.

### Faith ZAMAN, et al., Defendants.

### No. 06 Civ. 13626(LAK).

United States District Court, S.D. New York.

Feb. 7, 2007.

---

Brian Roy Socolow, John Anthony Piskora, Michael Philip Zweig, Loeb & Loeb LLP, New York City, for Plaintiffs.

Mark Alan Cymrot, Baker & Hostetler LLP, Washington, DC, for Defendants.

## MEMORANDUM AND ORDER

KAPLAN, District Judge.

Plaintiffs here seek a preliminary injunction that, as modified at page 4 of their supplemental memorandum,[1] would (1) restrain defendants from exercising control over, or participating in the affairs of, Westfields Invest Limited LLC ("Westfields"), Casa de Meadows, Cayman Islands Corp. LLC ("Delaware Casa"), and Golden Twist Ltd. ("Golden Twist"), and (2) require them to turn over to plaintiffs' counsel all corporate records in their possession, custody, or control belonging or relating to the foregoing companies and their assets. There are indications elsewhere in their papers, contrary to the statement on page 4 of their supplemental memorandum, that they press their demand for an injunction barring defendants "from using, disclosing or conveying confidential, privileged and/or proprietary information relating to Plaintiffs to any third parties."[2]

*Background*

### A. The Parties

Plaintiffs are (1) Duli Yang Teramat Mulia Paduka Seri Pengiran Digadong Sahibul Mal Pengiran Muda Haji Jefri Bolkiah, the youngest brother of the ruling Sultan of Brunei ("Prince Jefri"), and (2) two corporations, Cedar Swamp Holdings, Inc. ("Cedar Swamp") and Casa de Meadows, Inc., and a limited partnership known as Amedeo Hotels Limited Partnership ("Amedeo"), which owns or operates the New York Palace Hotel. Prince Jefri is alleged to be, directly or indirectly, the sole beneficial owner of the other plaintiffs.[3] Importantly for present purposes, he was sued several years ago by the State of Brunei and the Brunei Investment Agency ("BIA") for alleged misappropriation of $15 billion, settled the case by undertaking to return the assets acquired with the misappropriated funds, and now is a defendant in actions in Brunei and New York that seek to compel compliance with the settlement.[4]

The principal defendants are (1) Faith Zaman and Thomas William Derbyshire, husband and wife as well as English barristers, (2) Delaware Casa, which, curiously, is said to be a limited liability company and, even more curiously, is said to be both a Cayman Islands and a Delaware entity,[5] (3) Westfields, (4) Charles Hoareau, (5) Eurofinch Limited, (6) Fitzjohn's Holdings, Inc., (7) Oceanview Estate LLC, (8) Sam Zaman, the mother of Faith Zaman,[6] and (9) Arzie Zamarni, Zaman's half brother. Zaman and Derbyshire were close advisors to Prince Jefri.[7] Zaman, in particular, was made a director of 30 companies, coordinated the Prince's business activities, and managed his law firms

---

1. Docket item 4.

2. Order to Show Cause, dated Dec. 7, 2006 (docket item 3) ("Order to Show Cause") at 3; *see generally* Pl. Mem. in Supp. Mot. to Seal (docket item 32); *see also* Pl. Supp. Mem. 5–6.

3. Cpt. ¶¶ 5–7.

4. Derbyshire Decl. ¶¶ 4–6; *see* Def. Ex. 2 (Marr Aff.) ¶¶ 1, 26–29.

5. Cpt. ¶ 12.

6. As Sam Zaman's involvement in this action is not pertinent to this motion, "Zaman" subsequently refers to Faith Zaman.

7. Cpt. ¶ 20.

around the world. On November 7, 2006, she was dismissed as Prince Jefri's advisor and from her position at the Palace Hotel. Her power of attorney was revoked.[8]

### B. The Claims

According to the complaint, Zaman and Derbyshire breached their fiduciary and other obligations by (1) selling property called the Sunningdale Estate, which was owned by Cedar Swamp, to Westfields at far below fair market value, (2) misappropriating funds forwarded to them for delivery to others, (3) improperly using corporate credit cards, (4) orchestrating a fraudulent scheme involving the purchase of over $4 million worth of televisions for a hotel owned by Amedeo, and (5) causing Amedeo to enter into below market leases to entities controlled by Zaman and Derbyshire at below market rates.[9]

Zaman and Derbyshire stoutly deny the charges against them. Indeed, they contend that this suit is part of a scheme to blacken their reputations and to prevent them from telling the BIA what they know about Prince Jefri. Moreover, they claim that Prince Jefri authorized the transactions in question.

### Discussion

■ "A party seeking a preliminary injunction must establish irreparable harm and either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in its favor."[10] To the extent that provisional relief is mandatory in nature—that is, where it "will alter, rather than maintain, the *status quo*" "by commanding some positive act"—there must be "a clear showing that the moving party is entitled to the relief requested, or [that] extreme or very serious damage will result from a denial of preliminary relief."[11]

While this motion is characterized by charge and counter-charge that doubtless raise many factual issues, it is unnecessary to get into the merits to any substantial degree, as other elements of these standards are fatal to plaintiffs' motion.

### A. The Prohibitory Injunction—Irreparable Harm

■ The core of the motion is plaintiffs' request that defendants be enjoined from taking any action to exercise control over, or participate in the affairs of, Westfields, Delaware Casa, or Golden Twist.

There is no evidence whatsoever that Zaman or Derbyshire has exercised any influence or control over Delaware Casa or Golden Twist since they fell out with Prince Jefri. The only evidence with respect to Westfields is weak at best.

Westfields was the purchaser of the Sunningdale Estate in a transaction that, according to the complaint, closed on March 10, 2006.[12] Plaintiffs have submitted a declaration of Brian R. Socolow, one of their attorneys, who states that he spoke with one Brian Peterson, the caretaker at Sunningdale, in December 2006. Mr. Socolow asserts that

- He asked Mr. Peterson whether Zaman or Derbyshire had been involved with the removal of various household items from the estate on a truck that

---

Zaman and Derbyshire assert, and plaintiffs now accept, that Prince Jefri beneficially owns Delaware Casa, Westfields, and Golden Twist. *See* Hearing, Dec. 15, 2006 at 17–23; Pl. Supp. Mem. 3–4.

**8.** Zaman Decl. ¶ 2–7, 87.

**9.** Cpt. ¶¶ 32–78.

**10.** *Kamerling v. Massanari*, 295 F.3d 206, 214 (2002).

**11.** *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33–34 (2d Cir.1995).

**12.** Cpt. ¶ 44.

had been backed up to the house. Mr. Peterson allegedly did not deny that "this had occurred" and supposedly said Mr. Socolow would have to speak to Zaman or her attorney about it.

- Mr. Peterson allegedly said that he had discussed with Zaman an approach he had received from potential buyers of the property, that she had given permission for the prospective buyers to view the property, and that Peterson believed that this occurred after November 7, 2006, the date of Zaman's termination.

- Mr. Peterson allegedly said also that Zaman, at the time of the conversation, was giving him instructions about Sunningdale, that she had not told him that she had been terminated, and that she asked him to send further reports to her at a post office box in New York rather than at the Palace Hotel.[13]

As is evident from the foregoing, there is no evidence that Zaman or Derbyshire had anything to do with the truck incident.[14] Zaman flatly denies any knowledge of or involvement with it, if indeed it occurred.[15] In any case, any incident may well have antedated the termination of Zaman and Derbyshire.

Zaman acknowledges that Mr. Peterson called her shortly after she was terminated about a broker who wanted to show the property. She says she told him to continue to follow his instructions, which Zaman previously had given on Prince Jefri's in-

structions to her, until told otherwise. Those instructions were to allow certain brokers to show the property.[16]

■■■ "[A] clear showing of a threat of irreparable harm is essential" to justify a preliminary injunction.[17] The threatened irreparable harm, moreover, "must be ... actual and imminent, not remote or speculative." [18]

Here, there is no evidence that Zaman and Derbyshire have tried to influence or control Delaware Casa and Golden Twist since they were terminated. The case as to Westfields is a declaration of an attorney who lacks any personal knowledge of the facts and that does no more than report hearsay from a caretaker of property beneficially owned by Prince Jefri. No explanation is given for the lack of an affidavit from the caretaker. The vague assertions of the attorney are refuted by Zaman, who has given a perfectly reasonable explanation for the conversation with Mr. Peterson.

In these circumstances, plaintiffs, to the extent that they seek to restrain the defendants from exercising control over these three entities, have failed to make the requisite clear showing of threatened irreparable harm. There simply is no persuasive reason to suppose that defendants have sought to influence these three entities since the termination nor that they have any intention of seeking to do so.[19] In any case, as Prince Jefri concededly is the beneficial owner of all three entities,

---

**13.** Socolow Decl., Dec. 14, 2006, ¶¶ 3–5.

**14.** Counsel's assertion about the truck incident is more consistent with Mr. Peterson failing to deny that someone sent a truck to retrieve items from the house than it is with a failure to deny that Zaman and/or Derbyshire were involved.

**15.** Zaman Decl. ¶ 94.

**16.** *Id.* ¶ 95.

**17.** *E.g., Triebwasser v. American Tel. & Tel. Co.,* 535 F.2d 1356, 1359 (2d Cir.1976).

**18.** *Kamerling,* 295 F.3d at 214.

**19.** Had plaintiffs submitted a declaration of Mr. Peterson, and had it actually raised a genuine issue of fact when laid alongside that of Zaman, an evidentiary hearing might have been appropriate, although the Court does not so decide. In its absence, the Court sees no reason for a hearing.

he is perfectly capable of protecting himself without the aid of this Court.

## B. Prohibitory Injunction—Gag Order

■ Plaintiffs' application for an order barring defendants "from using, disclosing or conveying confidential, privileged and/or proprietary information relating to Plaintiffs to any third parties" rests on a December 2, 2006 e-mail by Zaman to various lawyers representing Prince Jefri to which was attached a memorandum by Derbyshire.[20]

The memorandum recites that it was written upon Derbyshire's learning from the press of the filing of this lawsuit. It professes shock at what he terms Prince Jefri's "shameful and dishonest" betrayal and attributes it to a fear that Derbyshire would assist the State of Brunei in its legal actions against Prince Jefri. It denies the allegations against Derbyshire and makes clear that Derbyshire intends "to tell the whole truth about all [his] dealings with Prince Jefri and his associates" which, it says, "will [include] the truth about all [his] dealings on behalf of [Prince Jefri's] wives" and others. It concludes with a demand that this action be withdrawn in default of which Derbyshire "shall be forced to disclose to the world the truth about Prince Jefri and his associates."[21]

This prayer for an injunction is troublesome. There are competing considerations.

As an initial matter, Rule 65(d) requires that "[e]very order granting an injunction ... be specific in terms" and that it "describe in reasonable detail ... the act or acts sought to be restrained."[22] The meaning of the critical language proposed by plaintiffs—"confidential, privileged and/or proprietary information relating to Plaintiffs"—however, is not free from doubt. While courts sometimes, but by no means uniformly, permit some breadth in injunctive language,[23] the somewhat debatable meaning of these terms cuts against this relief.[24]

Second, plaintiffs' application is blunderbuss in nature. No effort has been made to identify any specific information to which it is addressed. Nor has any effort been made to establish the existence of attorney-client privilege as to anything in particular.

Third, the proposed relief is drastically overbroad. Defendants plainly have the right to use any confidential, privileged and/or proprietary information to defend themselves against the charges leveled in this action by the plaintiffs.[25]

---

20. Def. Ex. 33.

21. *Id.*

22. Fed.R.Civ.P. 65(d).

23. *Compare S.C. Johnson & Son, Inc. v. Clorox Co.,* 241 F.3d 232, 241 (2d Cir.2001) *and Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc.,* 646 F.2d 800, 809 (2d Cir.1981), *with Medallic Art Co. Ltd. v. Washington Mint, LLC,* 208 F.3d 203, 2000 WL 298253, *3 (2d Cir. 2000), Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41, 51 (2d Cir.1996), *Fonar Corp. v. Deccaid Services, Inc.,* 983 F.2d 427, 429 (2d Cir.1993), *and Sanders v. Air Line Pilots Ass'n, Int'l,* 473 F.2d 244, 246–48 (2d Cir.1972).

24. *See, e.g., Medallic Art,* 208 F.3d 203, 2000 WL at 298253, *3 (injunction insufficiently clear where it prohibited defendant from "copy[ing] the creative elements of [plaintiff's] designs"); *Peregrine Myanmar,* 89 F.3d at 51 (injunction insufficiently clear where it enjoined defendant from filing "spurious" lawsuits); *Sanders,* 473 F.2d at 246–48 (2d Cir.1972) (proposed preliminary injunction order insufficiently clear where it would have prohibited defendant from committing a "breach ... of its duty of fair representation under the Railway Labor Act," because that duty embraced a wide range of reasonable behavior).

25. *See, e.g.,* N.Y.Code Prof. Resp. DR 4–101.C.4 (lawyer may use confidential and privileged

■ On the other hand, it seems reasonably likely that Zaman and Derbyshire have at least some obligations of confidentiality toward Prince Jefri, whether they arise out of fiduciary relationships or the attorney-client privilege. Moreover, the First Amendment is not a complete obstacle to relief where, as here, an obligation to maintain confidentiality arises from a voluntary agreement by the proposed speaker.[26]

The December 2 e-mail plainly was a threat, though quite possibly one made in the heat of the moment. Were Zaman and Derbyshire to carry through on it, they well could cause irreparable injury. In view of the fact that the positions they assumed voluntarily and profited from entailed obligations of confidentiality, a weighing of the considerations outlined above warrants some relief. Nevertheless, it will not be nearly as broad as plaintiffs seek.

## C. The Mandatory Injunction—Corporate Records

Plaintiffs originally sought an order requiring Zaman and Derbyshire to inventory and turn over all documents and other property removed from offices at the Palace Hotel on November 9, 2006.[27] Their supplemental memorandum dropped this request.[28] It substituted, however, a demand for a preliminary injunction requiring the defendants to turn over corporate records of Westfields, Delaware Casa and Golden Twist. Apart from that request, however, neither the memorandum nor the

declarations submitted at the same time seeks to justify it.

Courts understandably are reluctant to address new arguments first made in reply papers, as this deprives adversaries of an adequate opportunity to respond.[29] That is the case here. Moreover, there has been no showing of threatened irreparable injury and no showing of why the issue cannot be resolved consensually or through the discovery process. The Court therefore declines to address the question now, although it would be prepared to do so, if that proves necessary, on another motion.

## Conclusion

For the foregoing reasons, plaintiffs' motion for a preliminary injunction is granted to the extent that defendants Zaman and Derbyshire hereby are enjoined and restrained, pending the determination of this action, from disclosing to third parties information conveyed to them in confidence by plaintiffs during their engagement by plaintiffs, provided, however, that nothing herein shall preclude them from:

(1) Using such information in this or any other action commenced against them by any of the plaintiffs.

(2) Responding to lawful compulsory process after first giving prompt notice to plaintiffs of their receipt of such process.

(3) Disclosing such information to third parties after the particular information disclosed has been disclosed publicly by plaintiffs or otherwise

---

information to defend against accusation of wrongful conduct).

**26.** *See Snepp v. United States,* 444 U.S. 507, 509 n. 3, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (no First Amendment violation in enforcing voluntary agreement between CIA and former agent requiring agent to submit any proposed publication to CIA for prior review).

**27.** Order to Show Cause 3.

**28.** *See* Pl. Supp. Mem. 4.

**29.** *E.g., Booking v. General Star Mgmt. Co.,* 254 F.3d 414, 418 (2d Cir.2001); *In re Adelphia Commc'ns Corp. Secs. and Derivative Litig.,* 398 F.Supp.2d 244, 250 n. 6 (S.D.N.Y. 2005).

been publicly disclosed without any participation by them in the disclosure.

The motion is denied in all other respects.

The foregoing constitute the Court's findings of fact and conclusions of law.

SO ORDERED.