**Charles E. MURRAY, Jr., Plaintiff,**

v.

**Alan K. SILBERSTEIN, et al., Defendants.**

Civ. A. No. 86–4730.

United States District Court, E.D. Pennsylvania.

Dec. 14, 1988.

Isadore A. Shrager, Sharon K. Wallis, Philadelphia, Pa., for plaintiff.

Howland W. Abramson, Charles W. Johns, Nancy E. Gilberg, Philadelphia, Pa., for defendants.

## MEMORANDUM OF OPINION

McGLYNN, District Judge.

### I. BACKGROUND

Plaintiff, Charles E. Murray, Jr., brought this action to prevent Defendant Alan K. Silberstein, President Judge of the Philadelphia Municipal Court, and the Municipal Court Board of Judges ("the Board") from removing him as Bail Commissioner. On August 15, 1986, I issued a preliminary injunction enjoining the Board from terminating Mr. Murray's employment until further notice. Subsequently, Plaintiff filed this motion for Judgment on the Pleadings pursuant to Fed.R.Civ.P. 12(c). In considering Plaintiff's motion, I must view the pleadings in the light most favorable to Defendant, the non-moving party. *Dyson v. General Motors Corp.*, 298 F.Supp. 1064, 1065–1066 (E.D.Pa.1969).

### II. FACTS

Most of the underlying facts are undisputed. The office of Bail Commissioner was established in 1984 by 42 Pa.Cons.Stat. Ann. [section] 1123(a)(5) (Purdon 1988) which permits the Municipal Court to appoint six Bail Commissioners for four-year terms. "The method of selection and appointment and removal of bail commissioners and establishing standards of conduct and the rights, responsibilities and authority of bail commissioners and the procedure for appealing from the decisions of the bail commissioners shall be provided by local rules adopted by the municipal court." *Id.*

Pursuant to this Act, the Municipal Court adopted the Philadelphia Municipal Court Bail Commissioner Rules ("PMCBCR") on November 16, 1988. PMCBCR 101(d) [1] pro-

---

**1.** "Removal of Bail Commissioner during the     terms for which he is appointed shall only be

vides for the removal of a Bail Commissioner only for cause ("incompetency, misconduct, neglect of duty, or physical or mental disability") with the concurrence of a majority of the Municipal Court judges. Rule 1.01 also requires that a "full specification of the charges ... [be] furnished to the Bail Commissioner and [that] he ... be accorded an opportunity to be heard by the judges of the Court" before he is removed from his position.

The facts underlying this dispute were first outlined by Judge Silberstein in his letter of July 3, 1986:

I have met with you over the past month and have made my position clear that if your wife continues as the Democratic Ward Leader that would be a breach of the agreement you made before you were selected as a Bail Commissioner and would be considered an act of misconduct under Section 1.01 of the Bail Commissioner Rules of our Court. In

addition, her continuance as Democratic Ward Leader while you are a Bail Commissioner of itself, would be an act of misconduct under Section 606(a), Section 700 and Section 704 of the Bail Commissioner Rules. Accordingly, it is my intention to recommend to the Board of Judges your removal as a Bail Commissioner of this Court.

The agreement to which Judge Silberstein referred was made between Mr. Murray and then President Judge Glancey at a time when Murray was being considered for the Bail Commissioner position. According to Judge Glancey, Plaintiff promised to resign his position as leader of the 61st ward if appointed Bail Commissioner. Furthermore, both he and his wife, Bridget A. Murray, agreed that she would not take over that position while her husband served as Bail Commissioner.[2] Judge Glancey, however, had no objection to her serving as

for incompetency, misconduct, neglect of duty, or physical or mental disability, but a Bail Commissioner's office shall be terminated if the court determines that the number of Bail Commissioners shall be reduced or that the services of the Bail Commissioners are no longer needed. Removal shall not occur unless a majority of all the Judges of the Court concurs in the order of removal. Before any order of removal shall be entered, a full specification of the charges shall be furnished to the Bail Commissioner and he shall be accorded an opportunity to be heard by the judges of the Court."

2. Judge Glancey testified as follows before the Board of Judges:

I went to the real estate office. Charley was there with Bridget ... I told Charley, for the first time, that I was going to favorably submit his name to the Board of Judges for one of those positions. And Charley said it was great. But I said he'll have to give up—you can't be the ward leader. He said, 'Of course.' And Charley said, 'Well, Bridget—I can turn it over to Bridget.' And Bridget was sitting there, remember, Charley? And I said, 'No.' I said, 'No, it wouldn't be proper for Bridget to be the ward leader.' I think Bridget was disappointed, at that time, because she felt she was going to do it. She looked like it. And I gave a couple of reasons. One that I specifically gave was, I said, 'Look Charley, you're going to be sitting down at the PAB, setting bail and if you get people in front of you from the 61st Ward, you've got some problems.' And, additionally, I don't know whether I said this or not, to be honest, the other reason was

that I felt, as a management method, if we're going to appoint somebody to a position, this Board of Judges and where we can appoint them or remove them, yet we then have to go to his wife to be retained for reelection, it really puts the judges in a very, very improper position. And that was that basis for my saying this to Charley. Charley agreed. Then, you said, 'Well, my father can come up from the shore. He'd be the ward leader. He can come up and take over the ward.' I said, 'That would be okay with me.' And the question was raised with Bridget being a committee woman. I said, 'Fine. Certainly. If she's elected by the people as the committee woman, she can be a committee woman. but she cannot be one of the Democratic ward leaders when you're talking about judges here who are running for election every two years.'

And so it was clear to me that that was the arrangement and I mean, nobody questioned that. I know Bridget was disappointed but they agreed to that.

I went back to the Board of Judges, on the next day or two, and I talked individually to a lot of our judges, and I also talked to the Board of Judges, and when we had our meeting, to see who we're going to approve for bail commissioner, and the question of whether Charley was going to be the ward leader, or his wife was going to be the ward leader, came up many many times, I assured the judges that she was not and he was not. And whether they considered that as part of their vote I can't say. But, at least—at least, that was one of the facts that I gave to the judges. Tr. 17–21.

committeeperson or to the suggestion that Plaintiff's father—himself a former ward leader—replace his son as leader of the 61st ward.

On February 19, 1985, Mr. Murray was appointed Bail Commissioner for a four-year term commencing February 22, 1985. On February 20, 1985, he resigned as ward leader; and on March 4, 1985, the Democratic Executive Committee of the 61st ward chose Plaintiff's father—Charles E. Murray, Sr.—to fill the leadership position vacancy.

Problems began in May 1986 when Mrs. Murray—having learned that her father-in-law would not seek reelection—announced that she would run for his position. Although Plaintiff allegedly tried to change her mind, Mrs. Murray ran and was elected ward leader on June 9, 1986.

On June 17, 1986, Judge Silberstein, as Acting President Judge of the Philadelphia Municipal Court, Judge Glancey, and Bernard A. Scally, III, the Court Administrator of Philadelphia Municipal Court, met with Plaintiff and advised him that they considered his wife's election to be a violation of his agreement. Judge Silberstein gave Mr. Murray until July 1, 1986 to secure his wife's resignation as ward leader or himself face removal proceedings. The deadline passed and Mr. Murray was charged in a letter dated July 3, 1986 with having violated PMCBCR 1.01, 6.06, 7.00 and 7.04. The letter also notified Plaintiff of a hearing scheduled before the Board of Judges on July 17, 1986 and provided that Plaintiff could "appear with counsel and with any witnesses [he] may wish to present."

At that meeting, the Board heard testimony from both Judge Glancey and Mr. Murray[3] but refused to hear from Mrs. Murray.[4] At the conclusion of the hearing, the Board voted to remove Plaintiff from his position as Bail Commissioner effective

August 15, 1986. On August 15, 1986, I issued a temporary injunction enjoining until further notice Judge Silberstein, individually and on behalf of the Board of Judges, from terminating Plaintiff's employment.

## III. FIRST AMENDMENT CLAIM

Plaintiff contends that his removal from office as Bail Commissioner pursuant to PMCBCR 1.01(d) violates his first amendment right to freedom of association. Specifically, Murray contends that the state has imposed an unconstitutional condition prohibiting him from exercising his first amendment right of association with his wife.

■■■ The first amendment protects the right to associate with others in pursuit of political, social, economic, educational and cultural ends. *Roberts v. United States Jaycees*, 468 U.S. 609, 622, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984). *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 907–909, 102 S.Ct. 3409, 3422–3424, 73 L.Ed.2d 1215, *reh'g denied*, 459 U.S. 898, 103 S.Ct. 199, 74 L.Ed.2d 160 (1982). It protects an individual's choice "to enter into and maintain certain intimate human relationships," and provides "a fundamental element of personal liberty." *Roberts*, 468 U.S. at 617–18, 104 S.Ct. at 3249. Although the United States Constitution does not expressly recognize a right to marital and familial association, those interests are protected by the first and fourteenth amendments. *Zablocki v. Redhail*, 434 U.S. 374, 383–86, 98 S.Ct. 673, 679–681, 54 L.Ed.2d 618 (1978); *Moore v. East Cleveland*, 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977).

■■■ The Board of Judges argues that Plaintiff waived his constitutional rights by entering into his agreement with Judge Glancey and thereafter accepting the Bail

---

**3.** Plaintiff testified that he understood the agreement to preclude his wife from *succeeding* him as ward leader, not precluding her from holding that position as long as he was a bail commissioner.

**4.** By Judge Silberstein: "Mr. Shrager [Plaintiff's attorney], the Board of Judges have ruled on the question of the relevance of Bridget Murray's testimony. And by majority of the Board, they feel that since your client [Plaintiff] already admitted the contents of the conversation and meeting that took place between Judge Glancey, his wife and himself, that any testimony she would want to present is irrelevant and, therefore, she'll not be permitted to testify." Tr. 73.

Commissioner position. Although a state may in some circumstances impose conditions of employment that infringe on first amendment freedoms, only when the state's interest in that condition outweighs the individual's rights will the condition pass constitutional muster. *See Fraternal Order of Police, Lodge 5 v. Philadelphia,* 812 F.2d 105 (3d Cir.1987) and cases cited therein.

A good example of the balancing process utilized by the courts may be found in *Fraternal Order of Police.* There, the Court of Appeals struck down portions of a questionnaire promulgated by the Philadelphia Police Department requiring applicants for a Special Investigations Unit ("SIU") "to disclose all organizational offices and directorships held by the applicant, his or her spouse and dependent children." *Id.,* 812 F.2d at 119. The court concluded that the provision unconstitutionally infringed on an applicant's first amendment rights since the question was overbroad and failed to effectuate the City's purposes: "it hardly seems likely that the memberships of a spouse and child would or should be relevant to the applicant's fitness for an SIU position." *Id.,* 812 F.2d at 119–20.

In order to balance the competing state and first amendment interests, however, the court had to dispose of the City's claim that the applicants had waived their constitutional rights by applying for the SIU positions. In addition to concluding that many of the purported waivers were not made voluntarily[5], the court rejected "the suggestion that the government can condition its selection of new employees on the applicants' waiver of their constitutional rights." *Id.* 812 F.2d at 112.

In the First Amendment context, the Supreme Court has repeatedly stated that generally 'a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.' *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983). When a condition of employment impinges on First Amendment interests, the Court has undertaken to balance the employee and state interests. *Id.; United States Civil Service Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 564, 93 S.Ct. 2880, 2889, 37 L.Ed.2d 796 (1973); *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). Inquiry into potentially unconstitutional conditions cannot be avoided on the ground that the employees waived their constitutional rights by applying for employment because that would eviscerate the court's opinions establishing a balancing standard.

*Id.,* 812 F.2d at 112.

■ The right to associate, however, is not absolute. A state may infringe on an individual's right to associate if it has a sufficiently compelling interest that "cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts,* 468 U.S. at 623, 104 S.Ct. at 3252.

Since the Board's decision to remove Mr. Murray for failing to keep his promise infringes on his first amendment rights, it is necessary to examine whether conditioning his employment on such a promise serves a sufficiently compelling state interest that cannot be achieved through less restrictive means.

The state purportedly required the guarantee in order to help insulate the judiciary from partisan political influence. "The presence of political constituents in the household of the Bail Commissioner coupled with presumed familial loyalties, political agendas and the perception that a Bail Commissioner's supervisors are beholden

---

5. "We believe it is illusory to treat all SIU applicants a volunteers. Commissioner Tucker testified that current members of the three divisions being phased out would be required to comply with the SIU application procedures to retain equivalent positions in the SIU. Failure to comply would result in a return to normal duty which could subject some of these officers, for example those who investigated misconduct by other police personnel, to reprisals.... Tests applied as a prerequisite for continued employment are hardly to be considered voluntary." *Id.,* 812 F.2d at 111.

to the Ward Leader creates a confluence improprietous appearances [sic]." Defendant's Motion at 8. Since public confidence in the judicial process is undermined by corruption as well as the appearance of impropriety, the state's interest in preserving the integrity of the judiciary is compelling.

Judge Glancey's commendable efforts to insulate the office of Bail Commissioner from extra-judicial influence is simply a recognition of the realities of political life in Philadelphia. Ward leaders, whose stock in trade is constituent service, are frequently called upon to render assistance to those individuals brought before the court for the purpose of setting bail. At a time when the reputation of the Philadelphia city courts is somewhat less than perfect, it seems only reasonable for the Board to require that its Bail Commissioner appointees be as free as possible from political pressures.

Arguably, certain problems are created by the "marital association" of ward leader and Bail Commissioner. A conflict might exist, for example, whenever Plaintiff sets bail for defendants from the 61st Ward. Because of his former political association with that ward and his current intimate association with its ward leader, Mr. Murray would often find it difficult to remain entirely neutral in discharging his duties. Although recusal might reduce some political pressure, recusal alone in matters affecting Mrs. Murray's constituency is an insufficient check against impropriety, since ward leaders are also amenable to servicing the needs of other ward leaders.

Furthermore, the potential for abuse is exacerbated by the fact that ward leaders wield great power in the selection and retention of judicial candidates. Since Mrs. Murray to some extent controls the level of support to be received by the Municipal Court judges during their retention elections, and since the power to appoint and remove Bail Commissioners is vested in the Municipal Court judges, the opportunity for improper influence or behavior is increased.[6]

■ In my opinion, no means less restrictive than removal exists to serve the state's compelling interest in judicial integrity. Even if, in carrying out his judicial duties, Plaintiff is neither consciously nor unconsciously affected by ward politics, the appearance of impropriety alone is a significantly important evil that cannot be avoided without his removal.

If a Bail Commissioner was a typical low-level bureaucrat or administrative clerk, the first amendment might offer more protection. *See, e.g., Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). However, the six Bail Commissioners that serve the city of Philadelphia have independent judicial responsibilities and are appointed by the Board of Judges in a political process.[7]

---

**6.** Plaintiff contends that

[i]n the ward organization it is the responsibility of the local committeeperson to provide direct service to their constituents. If a family member is arrested, it would be far more likely that the family would go to their committee person, who is their neighbor, than approach the ward leader directly.... It would be inappropriate for a ward leader to seek to influence a bail decision without personal knowledge of the defendant's community contacts.

Plaintiff's Memorandum in Response to Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment on the Pleadings at 10–11. This characterization of Philadelphia politics ignores reality: many committeepersons do not know the bail commissioners personally; consequently, the committeepersons often solicit as-

sistance from their ward leaders who are expected to make the necessary contacts.

**7.** *See* Tribe, Constitutional Law (1988) at 1018:

[M]embership in an otherwise protected association, or adherence to an otherwise protected belief, can in certain very limited settings justify denial of a governmental benefit. It is clear, for example, that persons who hate children and speak ill of them—something the first amendment protects even if without great enthusiasm—have no right to work for a public day care center [footnote omitted]. Just so, Democrats have no right to consideration on equal terms with Republicans when the newly elected Republican governor of a state is choosing a speechwriter or a high-level special assistant. Although there is no similar justification for making party membership decisive in filling the ranks of lower

This is not the first time that governmental anti-nepotism and anti-politicking rules have constitutionally infringed on first amendment freedoms in order to serve a greater good.

> [T]hose associational activities that are demonstrably incompatible with the mission of a given public agency or calling may be forbidden—not on a theory that public servants lose their constitutional rights when they assume government duty, but on a theory that such rights cannot be defined independent of the contexts in which they are asserted. Thus the Court has held that '[p]artisan political activities by federal employees must be limited if the Government is to operate effectively and fairly, elections are to play their proper part in representative government and employees themselves are to be sufficiently free from improper influences.' [8]

Tribe, Constitutional Law (1988) at 1018.[9]

■ Plaintiff made a reasonable and, I think, necessary "employment" agreement with Judge Glancey. The Supreme Court has recognized that employment contracts infringing on first amendment rights are not unconstitutional per se. Indeed, the Court suggested in *Snepp v. United States*, 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980), that where the employment involves a position of trust, a restrictive employment contract might be an appropriate method of ensuring that trust.

In its per curiam opinion, the Supreme Court in *Snepp* upheld the Court of Appeals determination that the petitioner had violated his employment contract with the CIA when he published a book—which, the Government conceded for the purposes of litigation, contained no national security secrets—without first submitting the manuscript to the agency for review. The court held Snepp to his agreement even though that agreement arguably infringed upon his first amendment rights.

> When Snepp accepted employment with the CIA, he voluntarily signed the agreement that expressly obligated him to submit any proposed publication for prior review. He does not claim that he executed this agreement under duress. Indeed, he voluntarily reaffirmed his obligation when he left the Agency. We agree with the Court of Appeals that Snepp's agreement is an 'entirely appropriate' exercise of the CIA Director's statutory mandate to 'protec[t] intelligence sources and methods from unauthorized disclosure,' [citation omitted].

*Id.*, 444 U.S. at 511 n. 3, 100 S.Ct. at 765 n. 3. Although the Court often defers to the Executive branch when dealing with issues of national security, the lessons of *Snepp* are applicable here, too, since the position of Bail Commissioner is also one of trust.

Plaintiff contends that even accepting Defendant's version of the Murray–Glancey discussion,

> the removal of Plaintiff from office for violation of this 'agreement' is impermissible for two reasons. First, no evidence was presented to establish that Plaintiff engaged in any conduct in violation of the 'agreement' with Judge Glancey. The only alleged misconduct was that of Plaintiff's wife, Bridget A. Murray, in running for ward leader and refusing to resign from that position once she was

---

government posts [footnote omitted], the argument for allowing ideological criteria at levels of high policy significance seems sufficiently compelling to withstand first amendment attack [footnote omitted].

**8.** "*United States Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548 [93 S.Ct. 2880, 37 L.Ed.2d 796] (1973) (upholding a prohibition of federal employees' taking an 'active part in political management or in political campaigns') *Broadrick v. Oklahoma*, 413 U.S. 601 [93 S.Ct. 2908, 37 L.Ed.2d 830] (1973) (upholding state regulation of political activities by state regulation of political activi-

ties by state employees more stringent than federal law). See also *United Public Workers of America v. Mitchell*, 330 U.S. 75 [67 S.Ct. 556, 91 L.Ed. 754] (1947) (upholding constitutionality of Hatch Act limitations on federal employees' political activities)."

**9.** *See also*, 28 U.S.C. § 458 which provides: "[n]o person shall be appointed to or employed in any office or duty in any court who is related by affinity or consanguinity within the degree of first cousin to any justice or judge of such court."

elected. Thus, if anyone breached the 'agreement' with Judge Glancey it was not Plaintiff, but his wife, Bridget A. Murray. In the absence of evidence of Plaintiff's instigation of her conduct, and particularly in light of the evidence that he actively pressured her to resign her position as ward leader, Bridget A. Murray's conduct cannot be imputed to her husband.

Memorandum in Support of Motion on the Pleadings at 7–8.

Mr. Murray, however, is not being punished for the conduct of his wife. Rather, he faces the consequences of his own actions. This dispute is about *his* activities: *his* explicit promise that his wife would not become leader of the 61st ward while he served as Bail Commissioner; his implicit guarantee that he would not serve as bail commissioner should his wife become ward leader; and *his* failure to resign after his wife's election.

## IV. INTERPRETATION AND APPLICATION OF PMCBCR 1.01

██ Plaintiff was removed from his position for "misconduct" pursuant to PMCBCR 1.01. He argues that the Board incorrectly interpreted or applied Rule 1.01 by concluding that his failure to resign constitutes misconduct. The constitutional dimension of his argument turns on the purported *ad hoc* application of the Board's "no-spouse-as-ward-leader" policy. Mr. Murray contends that

> the issue is not whether the Philadelphia Municipal Court may enforce a rule or general policy preventing wives or spouses of Bail Commissioners from holding the position of ward leader while their husbands or spouses are Bail Commissioners, but rather whether the Board of Judges may enforce an *ad hoc* restriction applied to Bridget A. Murray alone, prohibiting her from serving as ward leader while her husband holds office as Bail Commissioner.

Plaintiff's Memorandum in Support of Motion for Judgment on the Pleadings at 8–9.

Mr. Murray ignores the fact that the current six Bail Commissioners are the only individuals ever to have been appointed pursuant to 42 Pa.Cons.Stat.Ann. [section] 1123(a)(5) (Purdon 1988) and that the Board had never before confronted the conflict-of-interest problems presented in the Murrays' case. Faced with the likely possibility that Mrs. Murray would replace her husband as ward leader, Judge Glancey, acting for the Board, reached his agreement with Plaintiff. It was obviously unnecessary, however, to require similar promises from the other candidates who were not themselves ward leaders. Consequently, Mr. Murray cannot complain that he was the only applicant to be affected by the Board's policy unless he can demonstrate that the Board subsequently appointed another ward leader as Bail Commissioner without extracting the same commitment.[10]

## V. PROCEDURAL DUE PROCESS

██ Plaintiff finally contends that the Board's decision to remove him after refusing to hear his wife's testimony deprived him of a property interest without due process of law as guaranteed by the fourteenth amendment of the United States Constitution. Although state law spells out the limits of a constitutionally protected property interest, federal law defines the process that is due before a state can deprive an individual of that interest. *Vitek v. Jones*, 445 U.S. 480, 491, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552 (1980); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 432, 102 S.Ct. 1148, 1156, 71 L.Ed.2d 265 (1982).

██ The process due in this case is limited: "The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Cleveland*

---

**10.** Although Plaintiff's Motion for Judgment on the Pleadings deals specifically with only purported constitutional violations, the "misinterpretation" argument may attempt to express a pendent state claim for relief. To the extent it does, however, I predict that the Pennsylvania Supreme Court would affirm the administrative determination that Plaintiff's breach of a material condition of his appointment constitutes misconduct.

*Board of Education v. Loudermill,* 470 U.S. 532 at 546, 105 S.Ct. 1487 at 1495, 84 L.Ed.2d 494 (1985). Plaintiff was given just that.

Plaintiff, however, objects to the Board's refusal to permit his wife to testify after they heard his own testimony and that of Judge Glancey. Although the judges decided by secret ballot, the reason for their decision can be gleaned from Judge Merriweather's comments:

> [W]e have one question, that was asked that is basically germane to the issue before this Board, that was asked by Judge Margiotti and answered by your client, number one, that he knew that he could not hold the office and remain or become a bail commissioner. Number two, that he acknowledges that Judge glancey told Both Mr. Murray and his wife that it was a no no.... We can't help it if he can't control Mrs. Bridget.

Tr. 71–71. The Board apparently believed that Mrs. Murray's testimony was irrelevant.

However, even if the judges refused to permit her testimony "on the theory that her testimony was either not credible, or would merely be repetitive of Plaintiff's testimony, because she is his wife," Plaintiff's Motion for Judgment on the Pleadings at 25, Plaintiff still would have received the process due under the Constitution. " '[S]omething less' than a full evidentiary hearing is sufficient prior to adverse administrative action." *Cleveland Board of Education,* 470 U.S. at 545, 105 S.Ct. at 1495. Plaintiff received notice of the charges, heard Judge Glancey's testimony, and was given an opportunity to present his side of the story. "To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Id.,* 470 U.S. at 546, 105 S.Ct. at 1495.

## VI. CONCLUSION

Since Mr. Murray was afforded constitutionally adequate procedure, this court is neither required, nor permitted, to review any factual determinations explicitly or implicitly made by the Board. In addition, because the interpretation of Rule 1.01 is a matter of state law, and because I have already concluded that removal in the instant case does not violate Mr. Murray's constitutional rights, no other issues remain before this court. Consequently, I will not only deny Plaintiff's Motion for Judgment on the Pleadings, but I will also enter judgment in favor of Defendant pursuant to Fed.R.Civ.P. 12(c). Although Defendants have not moved for Judgment on the Pleadings, such an order is appropriate since I have determined that "there is no material issue of fact presented and that one party is clearly entitled to judgment." *Flora v. Home Federal Sav. and Loan Ass'n,* 685 F.2d 209 at 211 (7th Cir.1982).

### ORDER

AND NOW, this 14th day of December, 1988, judgment having been entered in favor of Defendant in the above-captioned matter, the preliminary injunction in effect since the inception of this action by agreement of the parties is hereby VACATED. The execution of this order shall be stayed for thirty days pending filing of a notice of appeal.